1
KESSLER TOPAZ
2
    MELTZER & CHECK, LLP
Ramzi Abadou (222567)
3
rabadou@ktmc.com
Eli R. Greenstein (217945)
4
egreenstein@ktmc.com
Stacey M. Kaplan (241989)
5
skaplan@ktmc.com
Erik D. Peterson (257098)
6
epeterson@ktmc.com
One Sansome Street, Suite 1850
7
San Francisco, CA 94104
Telephone:  (415) 400-3000
8
Facsimile:  (415) 400-3001

9
*Counsel for Plaintiff Claudia S. White*

10
11          UNITED STATES DISTRICT COURT
12          CENTRAL DISTRICT OF CALIFORNIA

13
CLAUDIA S. WHITE, Individually and
14
On Behalf of All Others Similarly
Situated,

Case No. SACV12 1708 DOC (MNx)

15                                     **CLASS ACTION COMPLAINT**
                     Plaintiff,

16
        v.                             **COMPLAINT FOR VIOLATIONS
17                                      OF THE FEDERAL SECURITIES
QUESTCOR PHARMACEUTICALS,              LAWS**
18
INC., DON M. BAILEY, MICHAEL H.
MULROY, STEPHEN L. CARTT and
DAVID YOUNG                            **JURY TRIAL DEMANDED**
19
                     Defendants.
20
21
22
23
24
25
26
27
28

Plaintiff, Claudia S. White ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Questcor Pharmaceuticals, Inc. ("Questcor" or the "Company") and securities analysts' reports and advisories about the Company. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal class action on behalf of persons who purchased or otherwise acquired Questcor securities between April 26, 2011 and September 21, 2012, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. Questcor is a biopharmaceutical company focused on the treatment of patients with serious, difficult-to-treat autoimmune and inflammatory disorders. Questcor's primary product is H.P. Acthar Gel (repository corticotropin injection) ("Acthar"), an injectable drug that is approved by the U.S. Food and Drug Administration ("FDA") for the treatment of 19 indications. Of these 19 indications, Questcor currently generates substantially all of its net sales from three indications: the treatment of proteinuria in idiopathic types of nephrotic syndrome, the treatment of acute exacerbations of multiple sclerosis ("MS") in adults, and the treatment of infantile spasms in children under two years of age ("West syndrome").

3. On September 19, 2012, Aetna Inc. ("Aetna"), one of country's largest insurance companies, announced that it had revised its policy concerning Acthar by severely limiting coverage for the drug. Following a review of the 19 indications that the FDA had approved for Acthar, Aetna determined that *the only "medically*

1

*necessary" indication for Acthar is infantile spasms*.[1]  As Aetna typically only reimburses for drugs that are deemed medically necessary, the treatment of infantile spasms thus became **the only reimbursable indication** for Acthar from Aetna. According to an Aetna spokesperson, Aetna's "previous position was that [Acthar] was a last-resort treatment….[Aetna] now state[s] that [Acthar] **is not medically necessary because there is no clinical evidence that the drug is more effective than steroids**."

4.     Upon the release of this news, shares of the Company's stock declined $24.17 per share, or almost 48 percent, to close on September 19, 2012 at $26.35 per share, on unusually heavy trading volume.

5.     Then, on September 24, 2012, Questcor disclosed that the U.S. government had initiated an investigation into the Company's promotional practices.

6.     On this news, the Company's stock declined an additional $11.05 per share, or almost 37 percent, to close at $19.08 per share on September 24, 2012, again on unusually heavy trading volume.

7.     Throughout the Class Period, Defendants misrepresented the suitability of Acthar and failed to disclose material adverse facts about the Company's financial well-being and prospects.  Specifically, Defendants failed to disclose: (1) that Questcor lacked clinical evidence to support the use of Acthar for indications other than infantile spasms; (2) that Questcor had engaged in questionable promotional practices in relation to the sale and use of Acthar in the treatment of MS and nephrotic syndrome; and (3) that, as a result of the foregoing, Questcor lacked a reasonable basis to make positive statements about the Company or its outlook, including statements about Acthar's efficacy and potential growth.

---

[1]     All emphases herein are added.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

11.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  Many of the acts and transactions alleged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District.  Additionally, Questcor's principal executive offices are located within this District.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## PARTIES

13.     Plaintiff, Claudia S. White, as set forth in the accompanying certification, incorporated by reference herein, purchased Questcor securities at artificially inflated prices during the Class Period and has been damaged thereby.

14.     Defendant Questcor is a California corporation with its principal executive offices located at 1300 North Kellogg Drive, Suite D, Anaheim Hills, California.

15.     Defendant Don M. Bailey ("Bailey") was, at all relevant times, the Company's President, Chief Executive Officer ("CEO"), and a director of the Company.

16.     Defendant Michael H. Mulroy ("Mulroy") was, at all relevant times, the Company's Chief Financial Officer ("CFO"), General Counsel and Corporate Secretary.

17.     Defendant Stephen L. Cartt ("Cartt") was, at all relevant times, the Company's Chief Operating Officer ("COO").

18.     Defendant David Young ("Young") was, at all relevant times, the Company's Chief Scientific Officer.

19.     Defendants Bailey, Mulroy, Cartt and Young are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of Questcor's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  Each Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and misleading.  As a result, the Individual Defendants are liable for the false statements pleaded herein.

## **SUBSTANTIVE ALLEGATIONS**

### **Background**

20.     Questcor is a biopharmaceutical company that relies on a single drug, Acthar, for almost all of its revenue.  Acthar is a highly specialized, low-volume injectable hormone drug that was originally approved by the FDA in 1952.  Acthar has been approved by the FDA for 19 indications, and it is a first-line treatment for infantile spasms (an extremely rare condition that affect 1,500 babies a year in the

U.S.).  Acthar was approved for the treatment of MS relapse in 1978.  It was used extensively as a treatment for MS in the 1970s, but was largely abandoned in the 1980s after the more effective corticosteroids came on the market.

21.    In 2001, Questcor purchased the rights to Acthar for $100,000.  At the time, Acthar was almost exclusively being used to treat infantile spasms.

22.    In August 2007, Questcor announced in a press release that its Board of Directors had approved a new strategy and business model for Acthar.  Specifically, the Company stated that it would initiate a new pricing model, raising the price of Acthar from $1,650 per vial to $23,000 per vial.  Questcor based this massive price increase on the FDA's approval of Acthar for the treatment of infantile spasms, and the Company's New Drug Application to obtain Orphan Drug status for Acthar for the treatment of that condition.  The FDA grants orphan status to a drug that treats a disease affecting fewer than 200,000 people.  Orphan status provides a company with seven years of marketing exclusivity.  The sudden price increase made Acthar profitable for the first time in its 60 year existence.  The FDA approved Questcor's orphan drug status application in October 2010.

23.    Shortly after the increase in Acthar's sale price, Questcor embarked on an aggressive strategy to transform Acthar into a pipeline, blockbuster drug.  The Company began to aggressively promote Acthar for other indications, including the treatment of MS and nephrotic syndrome.  Questcor actively markets Acthar as a second line treatment for MS after patients are not responsive to steroids and markets Acthar as a first-line treatment for nephrotic syndrome.

24.    Due to the new pricing and expanded promotion, Questcor's net sales increased from $49.8 million in 2007 to $218.2 million in 2011.  Currently, infantile spasms, the condition for which Acthar received orphan drug status, accounts for only 6 - 10% of the Company's revenues.

## Materially False and Misleading
## Statements Issued During the Class Period

25.    The Class Period begins on April 26, 2011.  On that day, the Company issued a press release announcing its first quarter 2011 financial results.  Therein, the Company reported net income of $11.2 million, or $0.17 diluted earnings per share ("EPS"), and net sales of $36.8 million for the first quarter of 2011.  The press release also stated, in relevant part:

> "Our strategy to expand the sales force is clearly paying off," said Don M. Bailey, President and CEO of Questcor.  "Paid MS prescriptions are up sharply from last quarter.  March was a particularly strong month and this momentum has continued so far in April.  We believe that Acthar is filling an increasingly important role in the treatment of exacerbations associated with MS and, looking forward, we expect to continue to grow sales in this important therapeutic area."

> Mr. Bailey added, "We are also encouraged by the early positive results from our small, dedicated nephrology sales team, which initiated selling efforts at the beginning of March.  The number of nephrologists who are using Acthar to treat patients with nephrotic syndrome is increasing."

26.    Also on April 26, 2011, Questcor held a conference call for investors to discuss its financial and operational results.   During the call, Defendants reiterated the record financial and operational results reported in the Company's press release, and Defendants Bailey and Cartt stated the following:

> [BAILEY]:  In summary, we are off to a very good start this year as we continue to execute our straightforward strategy to sell more Acthar.  Our decision to expand the MS sales force is clearly paying

off.  Also, our nephrotic syndrome sales force is having some early success.

\*       \*       \*

We believe this MS sales performance reflects the strong underlying demand for Acthar.  This growth in demand is being driven by the increasing productivity of our expanded sales force.  We believe net sales in the MS market are now about 60% of total Acthar net sales.

\*       \*       \*

[CARTT]:  Our expanded promotional activities directed to neurologists generated significant growth in Acthar prescriptions for MS during the first quarter.  During the quarter we shipped a record 508 paid Acthar prescriptions for the treatment of MS relapses.  This was an increase of 120% over the year ago period and 44% over the previous quarter.  We believe this performance is a strong signal that the sales force expansion has gained traction in the MS market at a faster rate than we expected.

\*       \*       \*

Our promotional efforts are increasingly focused on two main goals.  One, convincing an increasing number of prescribers about the benefits of using Acthar with their patients; and two, helping doctors, nurses and others in their medical practice become more effective at identifying potential Acthar patients.

\*       \*       \*

In addition to increased promotion by our sales reps, Acthar sales are benefiting from our sponsored physician speaker programs.  In these programs, existing Acthar prescribers present to small groups of physicians their experiences using Acthar and the published efficacy and safety data for Acthar in MS relapses.  When combined with

follow-up sales calls, these programs appear to be a key driver of our sales growth. Recently, we have been significantly increasing the number of speaker programs being conducted and expect to continue doing so in the future.

27. On April 27, 2011, Questcor filed its Quarterly Report with the SEC on Form 10-Q. The Company's Form 10-Q was signed by Defendants Bailey and Mulroy, and reaffirmed the Company's financial and operational results previously announced on April 26, 2011. Additionally, the Form 10-Q stated, in relevant part:

During the three months ended March 31, 2011, we achieved a significant increase in the number of prescriptions for Acthar to treat MS exacerbations, which was attributable to our expanded sales force calling on physicians who treat patients with MS.

28. On July 26, 2011, Questcor announced its second quarter 2011 financial results in a press release. The Company reported net income of $13.9 million, or $0.21 diluted EPS, and net sales of $46.0 million for the second quarter of 2011. The press release further stated, in relevant part:

"Clearly, Questcor had a terrific quarter," said Don M. Bailey, President and CEO of Questcor. "Our focus on expanding the use of Acthar in the treatment of MS exacerbations drove our record second quarter financial performance. Importantly, in spite of the rapid expansion in the use of Acthar for MS exacerbations, we believe that the prescriber base can continue to grow. Accordingly, growing MS sales remains our number one priority. Also, following our early success in nephrotic syndrome, we are immediately and substantially expanding our nephrology selling effort."

29. Also on July 26, 2011, Questcor held a conference call for investors to discuss its financial and operational results. During the call, Defendants reiterated

the record financial and operational results reported in the Company's press release, and Defendants Cartt and Bailey stated the following:

[CARTT]: During the quarter we shipped a record 751 paid Acthar prescription for the treatment of MS relapses.  This was an increase of 147% over the year-ago period and 48% over the previous quarter. We believe this performance is a strong signal that the sales force continues to gain traction in the MS market at a faster rate than we expected.  In addition to rapid growth, our trends in MS are all very good and indicate that we are building momentum in this key Acthar market.

\*     \*     \*

[BAILEY]:  Our go forward plan is extremely simple and remains to sell more Acthar.  That is, gross sales in each of our key markets, MS, NS, and IS, and then expand our commercial effort into other Acthar on-label markets and try to generate Acthar usage in those markets. In the second quarter, we continued our momentum and had increasing sales levels combined with strong profit margins and substantial free cash flow.

30.    On July 29, 2011, Questcor filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Bailey and Mulroy, and reaffirmed the Company's financial results previously announced on July 26, 2011.

31.    On October 25, 2011, Questcor issued a press release announcing its third quarter 2011 financial and operational results.  The Company reported net income of $22.9 million, or $0.35 diluted EPS, and net sales of $59.8 million for the third quarter of 2011.  The press release also stated, in relevant part:

"Questcor's strategy to sell more Acthar continues to generate increasing net sales and earnings," said Don M. Bailey, President and

CEO of Questcor. "Our commercial organization is steadily expanding the number of neurologists, nephrologists, and child neurologists prescribing Acthar. We believe Acthar has the potential to benefit many more MS, NS, IS and possibly lupus patients in the future."

"Our 77 person Specialty Sales Force continues to drive expanded usage of Acthar as second-line therapy for MS exacerbations, a key Acthar market," commented Steve Cartt, Executive Vice President and Chief Business Officer. "Furthermore, during the third quarter we completed the expansion of our Nephrology Sales Force from 5 to 28 representatives, with all new personnel being fully trained and making initial sales calls by October 1st. Despite the inherent disruption involved with this expansion, paid nephrotic syndrome Acthar prescriptions increased during the quarter. September was a particularly strong month for both MS and NS sales."

32. Also on October 25, 2011, Questcor held a conference call for investors to discuss its financial and operational results. During the call, Defendants reiterated the record financial results reported in the Company's press release, and Defendant Cartt stated the following:

[CARTT]: [W]e shipped 886 paid Acthar prescription for the treatment of MS relapses during the third quarter of 2011. This was an increase of 174% over the year ago period. In addition to strong script growth, other positive trends in our MS business indicate that we are building momentum in this key Acthar market.

\*      \*      \*

Switching gears to the subject of new scientific data, several Acthar related abstracts will be presented in November at the Annual Meeting of the America Society of Nephrology or ASN held this year in

10

Philadelphia.…The new data provide further insight into the immune-modulating and other therapeutic properties of Acthar specifically relating to kidney disease.

We believe availability of this data provides further evidence for the direct action of Acthar on kidney disease. Importantly, the first three abstracts shown may specifically enhance our near-term selling efforts in nephrology.

Our emerging understanding of the apparent immune-modulating properties of Acthar is also beginning to encourage us to investigate the potentially broader therapeutic applications of Acthar in other inflammatory and autoimmune diseases, many of which are already on the product label for Acthar.

33.   On October 27, 2011, Questcor filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Bailey and Mulroy, and reaffirmed the Company's financial results previously announced on October 25, 2011.

34.   On January 11, 2012, *TheStreetSweeper.org* announced that it intended to publish the first of a two-part investigative series about Questcor in the following week.  According to *TheStreetSweeper.org*:

The first article raises serious questions about the aggressive marketing practices that [Questcor] has used to generate explosive — but potentially unsustainable — growth in prescriptions for its only drug.   The second story further examines [Questcor's] business practices, while taking a hard look at the leaders who have struck it rich as a result of the company's controversial growth strategy.

35.   Questcor went to extensive lengths to refute the claims raised by *TheStreetSweeper.org* and defend the Company's business practices.  As a result, Questcor's stock remained artificially inflated.

36.   For example, on January 11, 2012, Questcor responded to the *TheStreetSweeper.org* allegations by issuing a press release which stated, in relevant part:

> The Company believes that its marketing and business practices are consistent with regulatory requirements and industry standard practices.   Questcor markets H.P. Acthar® Gel for the treatment of acute exacerbations of multiple sclerosis (MS) in adults, the treatment of nephrotic syndrome, and the treatment of infantile spasms in children under two years of age.   The Company maintains a compliance program, which is led by an experienced compliance officer and includes the active participation of Questcor's executive management team.   Questcor attributes its success to the ability of Acthar to potentially address the unmet medical need associated with MS exacerbations and nephrotic syndrome.   The Company is committed to providing access to Acthar to patients who need it, and marketing Acthar in accordance with regulatory requirements and industry standard practices.   Questcor plans to speak with the publication to discuss the Company and its marketing and business practices.

37.   On February 22, 2012, Questcor issued a press release announcing its fourth quarter and full year 2011 financial results.   The Company reported net income of $31.6 million, or $0.48 diluted EPS, and net sales of $75.5 million for the fourth quarter of 2011.   Additionally, the Company reported net income of $79.6 million, or $1.21 diluted EPS, and net sales of $218.2 million for fiscal year 2011. The press release further stated, in relevant part:

> "Net sales growth in the fourth quarter was driven by the increasing numbers of physicians who are recognizing the potential for Acthar to help patients with MS and NS," said Don M. Bailey, President and

CEO of Questcor.  "We are particularly encouraged by the growing number of physicians who recognize the therapeutic value of Acthar in their practices, especially for those patients who have not adequately responded to other treatments."

38.    Also on February 22, 2012, Questcor held a conference call for investors to discuss its financial and operational results.   During the call, Defendants reiterated the record financial results reported in the Company's press release, and Defendants Bailey and Cartt stated the following:

[BAILEY]: As we look ahead to 2012 and beyond, we believe we can sustainably grow our business due to three key factors.  First, Acthar provides benefits to many difficult-to-treat patients not responding to other treatments.  Second, our market penetration in terms of the total number of neurologists and nephrologists prescribing Acthar, while growing, remains relatively small.  And third, we have assembled an excellent, experienced commercial team to pursue our growth plan.  Our focus remains on helping patients with serious, difficult-to-treat medical conditions.

*       *       *

[CARTT]: A key priority of ours continues to be educating both physicians and patients about how Acthar is a viable treatment option for MS exacerbations or relapses, particularly in those patients not well served by steroids, which are generally considered first-line therapy by most neurologists. This focus drove our year-over-year increase in the number of paid Acthar prescriptions for MS. In the fourth quarter of 2011, there were 945 paid and shipped Acthar MS prescriptions, up from 354 scripts in the fourth quarter of 2010. This is a 167% year-over-year increase. There were several factors behind this growth: positive patient outcome, increasing awareness among

13

1     neurologists about how best to incorporate Acthar into their practices,

2     continued excellent Acthar insurance coverage for MS relapses, and

3     the increase in productivity of our MS commercial team, all combined

4     to generate this growth.

5                     \*      \*      \*

6     [BAILEY] We believe that because Acthar provides real and

7     substantial benefits to many patients who would otherwise continue to

8     suffer the effects of serious difficult-to-treat disorders, our growth

9     should be sustainable. We are expanding the Organization and

10     associated infrastructure to address the significant growth

11     opportunities in front of us. At the same time we are off to a good

12     start to 2012, with January MS, NS, and IS paid prescription each

13     having a good month.

14     39. On February 22, 2012, the Company filed its Annual Report with the

15 SEC on Form 10-K. The Company's Form 10-K was signed by Defendants Bailey

16 and Mulroy, and reaffirmed the Company's financial results previously announced.

17 Additionally, the Form 10-K stated:

18     Our total net sales for the Company were $218.2 million for the year

19     ended December 31, 2011 as compared to $115.1 million and $88.3

20     million for the years ended December 31, 2010 and 2009,

21     respectively. Approximately 100% of our net sales in each of these

22     years were from Acthar. Our net income was $79.6 million for the

23     year ended December 31, 2011 as compared to $35.1 million and

24     $26.6 million for the years ended December 31, 2010 and 2009,

25     respectively.

26     40. On April 24, 2012, Questcor issued a press release announcing its first

27 quarter 2012 financial results. The Company reported net income of $38.5 million,

28

or $0.58 diluted EPS, and net sales of $96.0 million for the first quarter of 2012. The press release also stated, in relevant part:

> "While our substantial NS commercial effort only began in the fourth quarter of 2011, the value of NS shipped prescriptions now exceeds that of MS," said Don M. Bailey, President and CEO of Questcor. "This faster-than-expected NS growth drove us to further expand the NS commercial effort prior to the additional expansion of our MS commercial team."

41.    Also on April 24, 2012, Questcor held a conference call for investors to discuss its financial results.  During the call, Defendants reiterated the record financial results reported in the Company's press release, and Defendants Bailey, Cartt and Young stated the following:

> [BAILEY]: We continue to expand nephrologist and neurologist awareness of patient benefits from Acthar and as a result, paid prescriptions continue to increase.  Driving our growth in the first quarter was the strong increase in paid prescriptions written by nephrologists to treat patients with nephrotic syndrome, a serious kidney ailment.  After a successful pilot program, we stepped up our nephrology commercial effort last October.  The expected revenues from nephrotic syndrome prescriptions are accelerating to the point that by our calculation, nephritic syndrome scrip value now exceeds MS.
>
> *      *      *
>
> [CARTT]: Insurance reimbursements for Acthar in nephrotic syndrome continues to be very good, with more than 85% of private insurance prescriptions covered.  We attribute this continued strong coverage to the severity of the health outcome if nephrotic syndrome is not adequately treated, coupled with the fact that Acthar is indicated

15

and approved in this condition, and there are few other treatment options.  Further supporting both coverage and prescribing activity is the ongoing flow of positive results coming from the various studies we are funding.

\*　　\*　　\*

[YOUNG]: As noted by the newest research analyst to cover Questcor, Acthar can truly be considered a pipeline within a drug.  While quite rare, there are in effect few other successful examples of the type of product.  Soliris and Botox come to mind, for example.  We have a significant opportunity with Acthar to expand use from our three existing markets that Steve just discussed to other markets that are part of the list of 19 approved on-label indications.  In addition, as we've been learning more about the pharmacology of Acthar, including how and why Acthar acts differently than steroids, there are many other new indications with unmet medical needs where we and others believe Acthar could provide a significant clinical benefit.

42.　　On April 26, 2012, Questcor filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Mulroy and Bailey, and reaffirmed the Company's financial results previously announced on April 24, 2012.  Additionally, the Form 10-Q stated, in relevant part:

In the quarter ended March 31, 2012, our expanded Nephrology Sales Force effort resulted in 238 new, paid NS prescriptions, a significant increase over the eighteen new, paid NS prescriptions in the quarter ended March 31, 2011.  During the three months ended March 31, 2012, the number of prescriptions for Acthar to treat MS exacerbations increased to 1,000 from 508 in the quarter ended March 31, 2011, which was attributable to our expanded sales force calling on physicians who treat patients with MS.  We also experienced 112

paid, new IS prescriptions in the first quarter of 2012, which were within the normal historic range.  These prescription figures are based on internal Company estimates and are subject to change as discussed in the "Important Notes Regarding Prescription Data" to the prescription table on page 19 of this report.  As Acthar is already considered by many child neurologists to be the treatment of choice in IS, we are reducing the number of sales calls to child neurologists.

43.     On July 9, 2012, Questcor's stock reached its Class Period high of $57.64 per share.

44.     On July 24, 2012, Questcor issued a press release announcing its second quarter 2012 financial results.  The Company reported net income of $41.5 million, or $0.65 diluted EPS, and net sales of $112.5 million for the second quarter of 2012.  The press release further stated, in relevant part:

"In the second quarter, we surpassed $100 million in quarterly net sales for the first time in our history," said Don M. Bailey, President and CEO of Questcor.  "Our strong financial results were driven by increasing usage of Acthar among nephrologists and neurologists. With the expansion of our Nephrology Sales Force now complete, the expansion of our Neurology Sales Force nearing completion, and the initial detailing effort of a small sales force in Rheumatology just getting started, we are optimistic about the potential for Acthar to help an increasing number of patients with serious, difficult-to-treat autoimmune and inflammatory disorders."

45.     Also on July 24, 2012, Questcor held a conference call for investors to discuss its financial and operational results.  During the call, Defendants reiterated the record financial results reported in the Company's press release, and Defendants Bailey and Cartt stated the following:

[BAILEY]: We made significant progress with our business in the last three months.  Financial performance again improved.  We almost doubled the number of shipped vials in the quarter, more than doubled net sales and tripled earnings from the year ago quarter.  Paid scripts increased for both nephrotic syndrome and MS….And we also made good progress in both our science and compliance programs.

\*          \*          \*

[CARTT]: Very importantly, we often hear anecdotally that Acthar treatment is producing positive results for patients.  This is not always the case, of course; not everyone responds, but clearly, many patients are benefiting significantly from this drug, and there are few other treatment options available.  All these factors are contributing to the rapid increase in Acthar usage in nephrotic syndrome.

\*          \*          \*

Our year-over-year growth in MS paid scripts is due to positive patient outcomes, increasing awareness about how Acthar can help patients who are not fully benefiting from other therapies, continued excellent Acthar insurance coverage for MS relapse and the increasing productivity of our MS commercial team.

46.     On July 25, 2012, Questcor filed its Quarterly Report with the SEC on Form 10-Q.  The Company's Form 10-Q was signed by Defendants Bailey and Mulroy, and reaffirmed the Company's financial results previously announced on July 24, 2012.  Additionally, the Form 10-Q stated, in relevant part:

We continue to experience significant growth in NS prescriptions and we completed the expansion of our nephrology sale[s] force from 28 to 58 representatives, with all new representatives trained and in the field as of May 29, 2012.

\*          \*          \*

18

1   We continue to experience significant growth in MS prescriptions and

2  are in the process of expanding our neurology sales force from 77 to

3  107 representatives, with hiring expected to be completed in August

4  2012.

5   47. The statements contained in ¶¶25-33, 36-42 and 44-46 were materially

6 false and misleading when made because Defendants failed to disclose or indicate

7 the following:  (1) that Questcor lacked clinical evidence to support the use of

8 Acthar for indications other than infantile spasms; (2) that Questcor had engaged in

9 questionable promotional practices in relation to the sale and use of Acthar in the

10 treatment of MS and nephrotic syndrome; and (3) that, as a result of the foregoing,

11 Questcor lacked a reasonable basis to make positive statements about the Company

12 or its outlook, including statements about Acthar's efficacy, potential growth, and

13 how it "can truly be considered a pipeline within a drug."

14        **The Truth Begins to Emerge**

15   48. Questions regarding Acthar's efficacy and Questcor's aggressive

16 promotion of the drug began to arise in January 2011.  Specifically, the Company's

17 stock fell $6.20 per share from a closing price of $41.54 per share on January 10,

18 2012 to close at $35.34 per share on January 11, 2012, a one-day decline of 15% on

19 unusually high volume, in response to news on January 11, 2011 that

20 *TheStreetSweeper.org* would publish a two part investigation regarding the

21 Company's marketing and business practice.  However, Defendants vehemently

22 denied allegations that the Company engaged in improper conduct.  Defendants'

23 denials maintained the artificial inflation of the Company's stock price.

24   49. On September 19, 2012, Citron Research ("Citron") reported that

25 Aetna, one of country's largest insurance companies, had revised its policy

26 concerning Acthar, severely limiting coverage for the drug.  Following a review of

27 the 19 indications that the FDA had approved for Acthar, Aetna determined that the

28 only "medically necessary" indication for Acthar is infantile spasms.  As Aetna

typically only reimburses drugs that are deemed medically necessary, the treatment of infantile spasms became the only reimbursable indication for Acthar for Aetna. According to an Aetna spokesperson, Aetna's "previous position was that [Acthar] was a last-resort treatment....[Aetna] now state[s] that [Acthar] is not medically necessary because there is no clinical evidence that the drug is more effective than steroids."

50.    Upon the release of this news, shares of the Company's stock declined $24.17 per share, or almost 48%, to close on September 19, 2012 at $26.35 per share, on unusually heavy trading volume.

51.    Then, on September 19, 2012, Questcor issued a press release entitled "Questcor Comments on Insurance Policy Bulletin," which stated, in relevant part:

> The Company is continuing to review the Clinical Policy Bulletin related to Acthar from Aetna Inc. ("Aetna").  Currently, the Company does not believe that the bulletin represents a material change in insurance coverage for Acthar by Aetna.  During 2012, Aetna has accounted for approximately 5% of the Company's shipped prescriptions for Acthar.  Based on its current assessment of the Clinical Policy Bulletin, the Company does not believe that the bulletin will have a material impact on the Company's results of operations.

52.    On September 24, 2012, Questcor disclosed, in a Form 8-K filed with the SEC, that the U.S. government had initiated an investigation into the Company's promotional practices.  On this news, shares of the Company's stock declined an additional $11.05 per share, or almost 37%, to close at $19.08 per share on September 24, 2012, again on unusually heavy trading volume.  Due to Defendants' false statements, Questcor stock traded at artificially inflated values during the Class Period.  As the market learned of the revelations alleged above, the Company's shares fell dramatically, losing approximately 67% of their value from

the Class Period high in response to the foregoing series of partial corrective disclosures.   The declines resulted in investors suffering significant economic losses.

### PLAINTIFF'S CLASS ACTION ALLEGATIONS

53.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Questcor securities during the Class Period (the "Class").   Excluded from the Class are Defendants, directors and officers of Questcor and their families and affiliates.

54.   The members of the Class are so numerous that joinder of all members is impracticable.   The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.   According to the Company's Form 10-K filed with the SEC on February 22, 2012, Questcor had over 62 million shares of stock outstanding, owned by thousands of persons.

55.   There is a well-defined community of interest in the questions of law and fact involved in this case.   Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a)   Whether the Securities Exchange Act was violated by Defendants;

(b)   Whether Defendants omitted and/or misrepresented material facts;

(c)   Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)   Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

(e)   Whether the prices of Questcor securities were artificially inflated; and

(f)     The extent of damage sustained by Class members and the appropriate measure of damages.

56.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

57.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

58.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

59.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.  The price of Questcor's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Questcor securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

60.     During the Class Period, the Defendants had actual knowledge, or were extremely reckless in not knowing, the misleading nature of the statements they made to investors concerning Acthar and the Company's financial results.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices and participated in a course of business that operated as a fraud or deceit on purchasers of Questcor's securities during the Class Period.

61.     Additionally, during the Class Period, and with the Company's securities trading at artificially inflated prices, Company insiders sold 3,037,934 shares of their personally held or controlled Questcor stock for gross proceeds of

over $103.9 million, including over $41 million in gross proceeds received by the Individual Defendants.   This trading by Company insiders is evidenced by the following chart:

| Date of Trade | Inside Trader | Number | Price per Share | Gross Proceeds |
| --- | --- | --- | --- | --- |
| 9/12/2012 | Don Bailey | 40,000 | $50.08 | $2,003,200 |
| 9/3/2012 | Mitchell Blutt | 10,000 | $47.60 | $476,000 |
| 9/3/2012 | Mitchell Blutt | 14,730 | $47.60 | $701,148 |
| 8/26/2012 | Don Bailey | 40,000 | $43.07 | $1,722,800 |
| 7/9/2012 | Don Bailey | 30,000 | $57.61 - $57.89 | $1,733,000 |
| 7/1/2012 | Mitchell Blutt | 70,000 | $53.11 | $3,717,700 |
| 6/10/2012 | Don Bailey | 30,000 | $45.37 | $1,361,100 |
| 5/9/2012 | Don Bailey | 30,000 | $39.65 - $39.66 | $1,190,000 |
| 5/3/2012 | Mitchell Blutt | 11,573 | $42.69 | $494,051 |
| 4/26/2012 | David Young | 70,000 | $42.81 | $2,996,700 |
| 4/18/2012 | Stephen Farrell | 25,000 | $42.00 | $1,050,000 |
| 4/9/2012 | Don Bailey | 30,000 | $40.92 | $1,227,600 |
| 3/8/2012 | Don Bailey | 30,000 | $35.31 - $36.87 | $1,083,000 |
| 2/9/2012 | Don Bailey | 30,000 | $34.59 - $34.97 | $1,043,000 |
| 1/9/2012 | Don Bailey | 30,000 | $41.87 | $1,256,100 |
| 12/8/2011 | Don Bailey | 30,000 | $43.18 - $44.94 | $1,322,000 |
| 11/15/2011 | Stephen Farrell | 30,000 | $43.21 - $43.73 | $1,304,000 |
| 11/14/2011 | Mitchell Blutt | 150,000 | $43.94 | $6,591,000 |
| 11/13/2011 | David J. Medeiros | 50,572 | $43.99 | $2,224,662 |
| 11/10/2011 | David J. Medeiros | 123,036 | $42.98 | $5,288,087 |
| 11/9/2011 | Don Bailey | 30,000 | $41.07 - $41.81 | $1,243,000 |
| 11/7/2011 | David J. Medeiros | 180,189 | $42.57 | $7,670,645 |
| 11/7/2011 | Stephen Cartt | 8,100 | $42.75 | $346,275 |
| 10/30/2011 | David Young | 79,724 | $41.03 - $41.4 | $3,286,000 |
| 10/30/2011 | David J. Medeiros | 62,469 | $42.26 - $42.65 | $2,652,000 |
| 10/30/2011 | Stephen Cartt | 25,000 | $42.60 | $1,065,000 |

| 10/27/2011 | David J. Medeiros | 147,756 | $41.55 | $6,139,261 |
|---|---|---|---|---|
| 10/27/2011 | Stephen Cartt | 139,286 | $41.36 | $5,760,868 |
| 10/9/2011 | Don Bailey | 30,000 | $31.43 - $32.45 | $958,000 |
| 9/11/2011 | Don Bailey | 30,000 | $25.28 - $28.90 | $813,000 |
| 9/11/2011 | Mitchell Blutt | 370,000 | $26.13 | $9,668,100 |
| 9/1/2011 | Kristine Engelke | 252 | $30.07 | $7,577 |
| 8/24/2011 | Don Bailey | 30,000 | $26.04 - $26.99 | $795,000 |
| 8/22/2011 | Kristine Engelke | 4,000 | $26.00 | $104,000 |
| 8/14/2011 | David Young | 6,092 | $32.00 | $194,944 |
| 8/14/2011 | Stephen Cartt | 47,155 | $31.50 | $1,485,382 |
| 8/11/2011 | David Young | 9,308 | $32.00 | $297,856 |
| 8/10/2011 | Kristine Engelke | 883 | $31.50 | $27,814 |
| 8/10/2011 | Stephen Cartt | 85,968 | $31.00 - $31.19 | $2,673,000 |
| 8/9/2011 | Stephen Cartt | 25,000 | $31.00 | $775,000 |
| 8/4/2011 | David Young | 10,000 | $28.50 | $285,000 |
| 8/3/2011 | Stephen Cartt | 25,513 | $30.17 | $769,727 |
| 8/2/2011 | David J. Medeiros | 94,500 | $31.18 | $2,946,510 |
| 5/15/2011 | Stephen Cartt | 79,087 | $22.04 | $1,743,077 |
| 5/12/2011 | Stephen Cartt | 70,400 | $22.73 | $1,600,192 |
| 5/11/2011 | David J. Medeiros | 115,128 | $22.07 | $2,540,874 |
| 5/2/2011 | David J. Medeiros | 4,500 | $20.38 | $91,710 |
| 5/1/2011 | David J. Medeiros | 80,372 | $20.70 | $1,663,700 |
| 4/28/2011 | David J. Medeiros | 204,841 | $20.36 | $4,170,562 |
| 4/28/2011 | Thompson, Virgil | 167,500 | $20.38 | $3,413,650 |
| **Totals:** | | **3,037,934** | | **$103,972,872** |

62.     The trading was also highly unusual in its scope.   For example, Defendant Cartt sold 61% (505,509 shares) of his Questcor stock (stock and options granted) during the Class Period, for total proceeds of $16,215,280, while Defendant Young sold 50% (175,124 shares) of his Questcor stock (stock and options granted) during the Class Period, for total proceeds of $7,047,324.

**Applicability of Presumption of Reliance:**
**Fraud on the Market Doctrine**

63.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

(a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)     The omissions and misrepresentations were material;

(c)     The Company's securities traded in an efficient market;

(d)     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)     Plaintiff and other members of the Class purchased Questcor securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

64.     At all relevant times, the market for Questcor securities was efficient for the following reasons, among others: (a) as a regulated issuer, Questcor filed periodic public reports with the SEC; and (b) Questcor regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts and other similar reporting services.

**NO SAFE HARBOR**

65.     Defendants' verbal "Safe Harbor" warnings accompanying its oral forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

66.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or

25

misleading and the FLS was authorized and/or approved by an executive officer of Questcor who knew that the FLS was false.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

## **FIRST CLAIM**

### **Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants**

67.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

68.    During the Class Period, Questcor and the Individual Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase Questcor securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, these Defendants, and each of them, took the actions set forth herein.

69.    Questcor and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Questcor securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued either as primary

participants in the wrongful and illegal conduct charged herein or as controlling persons.

## SECOND CLAIM

### Violation of Section 20(a) of
### the Exchange Act Against the Individual Defendants

70.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

71.     The Individual Defendants acted as controlling persons of Questcor within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.   The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

72.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

73.     As set forth above, Questcor and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this

1    Complaint.   By virtue of their positions as controlling persons, the Individual

2    Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct

3    and proximate result of Defendants' wrongful conduct, Plaintiff and other members

4    of the Class suffered damages in connection with their purchases of the Company's

5    securities during the Class Period.

6         **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

7         (a)   Determining that this action is a proper class action under Rule

8               23 of the Federal Rules of Civil Procedure;

9         (b)   Awarding compensatory damages and equitable relief in favor

10              of Plaintiff and the other Class members against all Defendants,

11              jointly and severally, for all damages sustained as a result of

12              Defendants' wrongdoing, in an amount to be proven at trial,

13              including interest thereon;

14        (c)   Awarding Plaintiff and the Class their reasonable costs and

15              expenses incurred in this action, including counsel fees and

16              expert fees; and

17        (d)   Such other and further relief as the Court may deem just and

18              proper.

19                        **JURY TRIAL DEMANDED**

20        Plaintiff hereby demands a trial by jury.

21   DATED: October 3, 2012                KESSLER TOPAZ
22                                         MELTZER & CHECK, LLP
23
24                                         Ramzi Abadou
                                           Eli R. Greenstein
25                                         Stacey M. Kaplan
                                           Erik D. Peterson
26                                         One Sansome Street, Suite 1850
                                           San Francisco, CA 94104
27                                         Telephone:  (415) 400-3000
                                           Facsimile:  (415) 400-3001
28
                                           *Counsel for Plaintiff Claudia S. White*

## CERTIFICATION

I, **Claudia S. White**, ("Plaintiff") declare, as to the claims asserted under the federal securities laws, that:

1.  Plaintiff has reviewed the Complaint, and authorizes its filing.

2.  Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3.  Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition and trial, if necessary.

4.  Plaintiff's purchase and sale transaction(s) in the **Questcor Pharmaceuticals, Inc. (Nasdaq: QCOR)** security that is the subject of this action during the Class Period is/are on the attached Schedule A.

5.  Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6.  During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below: _____.

7.  Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this _1st_ day of _October_, 2012.

_Claudia S. White_
_____
**CLAUDIA S. WHITE**

SCHEDULE A

| Type of Security (common stock, preferred, option, or bond) | Number of Shares | Bought (B) | Sold (S) | Date | Price per share |
|---|---|---|---|---|---|
| Common Stock | 210 | (B) | | 12/27/11 | $43.23 |
| Common Stock | 210 | | (S) | 1/12/12 | $36.10 |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge David O. Carter and the assigned discovery Magistrate Judge is Arthur Nakazato.

The case number on all documents filed with the Court should read as follows:

## SACV12- 1708 DOC (ANx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=======================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] **Western Division** | [✓] **Southern Division** | [ ] **Eastern Division** |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| CLAUDIA S. WHITE, Individually and on Behalf of All<br>Others Similarly Situated<br><br>*Plaintiff(s)*<br>v.<br>QUESTCOR PHARMACEUTICALS, INC., DON M.<br>BAILEY, MICHAEL H. MULROY, STEPHEN L.<br>CARTT and DAVID YOUNG<br><br>*Defendant(s)* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**SACV12 1708** DOC(MLGx)

Civil Action No.

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*  See Attachment A

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   KESSLER TOPAZ MELTZER & CHECK, LLP
Ramzi Abadou (222567)
One Sansome Street, Suite 1850
San Francisco, CA 94104
Telephone:  (415) 400-3000
Facsimile:  (415) 400-3001

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.



CLERK OF COURT

JULIE PRADO

Date:   OCT - 3 2012

_____
*Signature of Clerk or Deputy Clerk*

AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

❒ I personally served the summons on the individual at *(place)* _____
_____ on *(date)* _____ ; or

❒ I left the summons at the individual's residence or usual place of abode with *(name)* _____
_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

❒ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____
_____ on *(date)* _____ ; or

❒ I returned the summons unexecuted because _____ ; or

❒ Other *(specify):*


My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .


I declare under penalty of perjury that this information is true.


Date: _____                    _____
                                                  *Server's signature*

                                          _____
                                                  *Printed name and title*


                                          _____
                                                  *Server's address*

Additional information regarding attempted service, etc:

**Attachment A**

Questcor Pharmaceuticals, Inc.
CT Corporation System
818 W. Seventh Street
Los Angeles, CA 90017

Don M. Bailey
5748 Grandview Avenue
Yorba Linda, CA 92886-5408

Stephen L. Cartt
3426 Brittan Avenue
San Carlos, CA 94070-3454

Michael H. Mulroy
22 Spanish Bay Drive
Newport Beach, CA 92660-9207

David Young
3912 Nelson House Road
Ellicott City, MD 21043-4841

UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| CLAUDIA S. WHITE, Individually and on Behalf of All Others Similarly Situated | QUESTCOR PHARMACEUTICALS, INC., DON M. BAILEY, MICHAEL H. MULROY, STEPHEN L. CARTT and DAVID YOUNG |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| KESSLER TOPAZ MELTZER & CHECK, LLP<br>Ramzi Abadou (222567)<br>One Sansome Street, Suite 1850, San Francisco, CA 94104<br>Telephone: (415) 400-3000 | |

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff   ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant   ☐ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** – For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify):   ☐ 6 Multi-District Litigation   ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes  ☐ No        ☐ **MONEY DEMANDED IN COMPLAINT: $**_____

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
Complaint for violations of the federal securities laws- 15 U.S.C. §§ 78j(b) and 78t(a) and 17 C.F.R. § 240.10b-5

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☐ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | **BANKRUPTCY** | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | | **FORFEITURE / PENALTY** | **PROPERTY RIGHTS** |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | **CIVIL RIGHTS** | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☒ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | **SOCIAL SECURITY** |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | **REAL PROPERTY** | **IMMIGRATION** | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 462 Naturalization Application | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 463 Habeas Corpus-Alien Detainee | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determination Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 465 Other Immigration Actions | | | **FEDERAL TAX SUITS** |
| | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

SACV12 1708

FOR OFFICE USE ONLY:   Case Number: _____

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a).  IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b).  RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): 12-cv-01623

Civil cases are deemed related if a previously filed case and the present case:
(Check all boxes that apply)  ☑ A.  Arise from the same or closely related transactions, happenings, or events; or
                             ☑ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
                             ☑ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
                             ☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐   Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| | New Haven County, Connecticut |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐   Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Orange County | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X.  SIGNATURE OF ATTORNEY (OR PRO PER):  _____  •  Date  October 3, 2012

Notice to Counsel/Parties:  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law.  This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but  is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |